May it please the Court. My name is Gregory Brown. I'm a Deputy Attorney General appearing on behalf of defendants and appellants. I'd like to reserve five minutes of my time. You may do so, Counsel. Just watch the clock. It counts down. Okay. Thank you. The District Court committed reversible legal error by second-guessing the policy decisions of California's elected representatives and preliminarily enjoining a validly enacted state statute without a valid legal basis for doing so. The District Court's preliminary injunction is not supported by any statutes, regulations, constitutional provisions, or case law and violates long-standing principles of federalism and separation of powers. Attorney-to-plaintiffs' individual claims offer to address their Medicaid Act claims. They begin with a comparability claim under Section A10b. Plaintiffs cannot prevail on their comparability claim because the wrongs that they have alleged simply do not amount to a violation of Section A10b's comparability provision. First and foremost, plaintiffs lack standing to raise this claim because they have not established that any named plaintiff has suffered a cognizable comparability injury. Plaintiffs Jones and Shepard do not even allege any comparability injury. Plaintiffs C.R. and Oster won't suffer any injury, in fact, because they're protected under the Lanternman Act and will receive replacement services. Is that, I mean, accepted by the other side? No, is that the Lanternman Act is, you know, will fully fund whatever services they need? Is that uncontroverted on this record? Well, the legal issue I don't think they dispute. They have claimed that two of the individual named plaintiffs have sought those services and have not factually been able to do so. Well, what do you mean the legal issue? I mean, you're saying that, you know, they're not harmed, but whether they're harmed is a factual issue, isn't it? You mean because they have a legal right, even though the legal right is not effectuated, they're not harmed? Well, if their legal rights under the Lanternman Act are not being effectuated, there's a different remedy, and they can seek an administrative hearing. No, but, oh, that's true, whether they get it or not. But what on the question of whether they're facing harm, can't that be considered? If you have a theoretical right, you're not being harmed. Is that your position? Well, we have to look at where the harm is coming from. In this instance. It's coming from the State. Well, the harm would be coming from a violation of the Lanternman Act, not anything having to do with ABX44, which is the statute at issue here. If they're not receiving services to which they are legally entitled under the Lanternman Act, there are separate proceedings, there are administrative proceedings, through their regional center to obtain those services. If that is the case, and I would dispute if that's even the case here, because it's very clear that they're legally entitled to those services. Well, on the other hand, if they sued under the Lanternman Act, your defense could be, well, you know, they should sue for a violation of the Medicaid Act, right? No, the Lanternman Act very clearly provides what they're entitled to under that. The issue here is whether the district court properly, preliminarily enjoined ABX44, and the question of whether they will be harmed by that action, I think the fact that they are absolutely legally entitled to these same services under the Lanternman Act means that they're not going to be harmed by ABX44. Did you make a motion for summary judgment on lack of standing? We have not made a ‑‑ we filed a motion to dismiss a 12B6, a 12B motion in the district court that is still pending, and it did raise some limited standing issues. The court hasn't ruled on that yet? It has not ruled on that yet. Well, why don't you get to the meat of the argument, and that is to what extent will the ‑‑ have the changes made in the California statute been based on need? Well, I think first and foremost, if we're talking about a comparability issue, which I suppose is a comparability issue, it's very clear that the state is absolutely entitled to make legislative policy judgments regarding setting forth need-based standards and utilization controls. The only thing that it may not do under the comparability provision is discriminate based on diagnosis, type of illness, or condition. Here, it's really indisputable that the state's standards are need-based. The only question raised by plaintiffs is, are those standards accurate? Are they perfect? Congress didn't want courts to get into a battle of experts to second guess those legislative policy decisions. What Congress said is, if your standards need-based, you're fine. If you're making a diagnosis, diagnosis-based, something based on illness, a classic example is the White case where a state said, you can have glasses if you have a certain type of medical condition, but not if you just have poor eyesight. That's a classic comparability violation. Let me go into the 11 services that are provided under IHSS on this question of need-based. One of them is eating. That's supposed to take up .127 hours a day. It seems to me that on need-based, some people, a quadriplegic, will require somebody to spoon-feed him in order to eat. And that will be a person that would qualify under the rankings as a number five, the person cannot perform the function with or without human assistance. Right? Correct. Eating, for somebody who is entitled to IHSS, who does not, is not a quadriplegic, but has Alzheimer's disease and forgets to eat. That same function can be effected not by having him spoon-fed, but perhaps by a phone call saying, say, Dave, it's noon. Time to eat. And he'll start eating. That person would be qualified as a rank two. A person needs verbal assistance such as reminding, guidance, or encouragement. But one thing is certain. Whether it's a quadriplegic being spoon-fed, a five, or an Alzheimer's patient being reminded by telephone, a two, they both need the service, otherwise they won't eat. And under this program, the two will be cut off, will not get his phone call, and the five will. They both have a comparable need. They have to eat to stay safely in their homes. It's a statutory test. The two will be cut out. The five will not be cut out. What's comparable about that? I would disagree that the needs are comparable. There's a clear difference. Needs aren't comparable? They don't have to eat? Well, there's a different level in the need. One person, the need can be met. Is it a different level or a different kind of need? I think it's actually both. I mean, one person can be, the need can be met with a simple phone call.  Another person requires full service and a full array of services. Again, what the State has done here, and this is a threshold matter, again, I don't think Congress intended for courts to be delving into these accuracy of need-based assessments. But even if we are to go there. No, the question is whether it's need-based, not the accuracy, but whether it's need-based. In other words, whether or not, I think Judge Bea's question is, if you cut off everybody with a level two, are you cutting off people who are need-based? That's the question, isn't it? The functional ranks are specifically designed to assess the degree of need for services. Is that designed in accordance with the statute? Is it need-based? That's the question, I think. Well, it absolutely is, Your Honor. And what's happened here is these assessments are made by trained social workers based on individual lives. I said the question is what the result is. Again, they're using a formula, and there's extensive guidance in all that. Does the formula provide that if you're a two, you don't need to eat anymore? The formula, it looks at your degree of need. So it's not if you're a level of two that you don't need to eat. Whether you're an Alzheimer's patient or a quadriplegic is the same. Eating, that's the need. That's the need that's listed here. Others are respiration, transfer, dressing, et cetera. Okay. The need, the task, is eating. What you're saying is a Alzheimer's patient who only needs a phone call is a number two. We don't have to do that anymore. If he forgets to eat, he forgets to eat. Well, there's a differentiation between the need to eat, which everyone has, and the need for services to help you eat, which, again, these two hypotheticals. Needs rather than ends. I see the ends as the needs. There are many methods which can accomplish the ends. What you want to do is to say, we can cut down on the ends and forget about the tasks, the needs. Is that what you're saying? My understanding of the law here is that what's at issue is the need for the services. Everyone has a need to eat, but the question here is, do the injured people have a need for services to help them eat? I thought the idea was to give services to make the home safe to remain in. Again, that is the overarching idea. What's happened here, the IHSS program has absolutely ballooned in recent years, and what the state has done is to look back and solve. You can cut it out. I have no objection to the state of California saying, we're going to save some money. We don't think it's absolutely necessary to be safe in your home that housework be done, nor that dressing be done, because people can walk around in their pajamas, and if they want to have a messy house, that's all right. It doesn't make it a danger to them. But there are other of these services, such as meal preparation and cleanup, bowel, bladder, and menstrual care, eating and respiration, which are necessary in order to make the house safe. And those are ends which your services must comply with. And with a lot of those hypotheticals that you've just raised, I think there is a serious standing problem. There's no named plaintiff that has any of those issues. So the court has not been able to assess in the context of a specific actual person. But assume, just for the purpose of discussion, that was not a standing problem. What's the response? If they can raise any claim out there. Once again, you have to look at this holistically. What other services are available? There are all kinds of backstops when you're talking about people with just mental impairments. There are mental health services available. There are services for people with developmental disabilities. And if people's need is as severe as the plaintiffs are claiming in a lot of these cases, again, by definition, their functional ranks are going to be high enough that they're going to get their services. Now, maybe we should just go back a step and look at the larger picture. Because I understand that the state has some discretion in terms of the services that it will offer. And if they adjust the services, they have to do it on a nondiscriminatory basis that is based on need. So I guess the first question is, what is the range of services or the package of services that is being offered here? The package of services, IHSS services, it's a large package of in-home supportive services. Well, would it be fair to say that it's in-home supportive services of substantial amount and sustained duration? In other words, these are services that are undertaken because of the need for longer-term need and assistance which is necessary to meet overall needs. Have I stated that accurately or not? Generally speaking, if I understood you correctly. Sure. Yes. Yes, and these are services provided to assist people in living in their homes, people who are elderly or disabled or otherwise have demonstrated need for those services. And again, the entire package is an optional Medicaid service. So the state under Medicaid could eliminate it entirely. Right. What the state has done here is make a policy decision. Let's preserve the program for the people with the highest level of need. And in order to do that, particularly with the financial crisis the state is facing. The people with the highest requirement of methods and services to accomplish a need are being saved. But people who don't need as many services to accomplish the same need are being eliminated. It depends how you need. If you define need in the amount of services provided as opposed to need as the final result of the human target to be provided. Eating is a need, but you want to define it as spoon feeding as opposed to telephone calls. I believe that's how it's been looked at in every case that has looked at this. Again, going back to the White case where we're talking about eyeglasses. Now we're getting somewhere. Do we have some guidance as to this type of procedure by some case in this circuit? There's nothing in the Ninth Circuit that provides any specific guidance. But if we look at what's been done in other circuits, and again, looking back to congressional intent, language of the statute, the regulations that implement it, it's very clear that the medical need they're talking about is the need for the assistance. Again, going back to the White case where they're talking about glasses, everyone has a need for eyesight. But again, they said it would be perfectly fine to say people with a certain level, people who need a prescription above a certain level need glasses, people whose prescription is below that don't get glasses. They said that would absolutely be fine under the comparability provision. The needed issue is the need for the services, not the need to eat, breathe, et cetera. Are the plaintiffs challenging the functional index definitions or, as to any individual plaintiff, where that plaintiff stands on the index or, for that matter, the functional rankings? I don't believe so. In their supplemental briefing, they alluded to the fact that they might go back and want to challenge that. But certainly, in their operative complaint, they have not made any allegations. But anyway, it would be fair to say that in prioritizing based on need, you simply applied a cutoff at a certain level, whether it was a four or a two, depending on the other parameters. These were existing categories. Correct. These categories have been in existence for over 20 years as a measurement. Counsel, you're down to three and a half minutes. You're welcome to reserve or keep talking. I'll reserve my remaining time for rebuttal. Very well. You may do so. We'll hear from the appellees. Counsel, will you take up? Wait a minute. Just a minute, Judge. Counsel, would you please introduce yourself for the record and also indicate, since there are two counsel listed, how you wish to allocate your time? Yes, Your Honor. My name is Stacey Layton, and I'm an attorney for the union plaintiffs. And I intend to reserve five minutes for my co-counsel, Melinda Bird, who represents the recipient plaintiffs. And our intent is to have Ms. Bird address the due process issues as well as the standing of the recipient plaintiffs. And I am prepared to address the other issues. Okay. You'll have to watch the clock to be sure that you can deliver to your co-counsel. Now, Judge. I would like to hear your side of the white case. In the white case, glasses were provided for persons who had specific ocular diseases, not based on a need to see 20-20, which could be caused by other diseases or congenital factors. Isn't that the kind of a case which allows a cutting back not based on need, because everybody has an equal need to see, but based on conditions such as a ranking five or a ranking two? Isn't counsel for the government correct on that issue? Your Honor, White v. Beale is directly on point here. And in White v. Beale, the State there had determined that individuals who had eye disease with the pathological source had a greater need for glasses. And the Court inquired as to whether that was true, that the source of the eyesight deterioration was a correct proxy for need or for medical necessity in Medicaid terms. The Court determined that it was not for a couple of reasons. One was that, in fact, the State was wrong that glasses would actually reverse the decline of eyesight caused by a pathological disease. And the other was that in many cases, people whose eyesight had deteriorated for other reasons had worse vision or equivalent vision to those whose eyesight deterioration was caused by a pathological disease. That is very similar to here, where what the State is saying is that this is a proxy for need. The functional index score and the functional rankings are proxies for how badly people need in-home supportive services. Before you get on to that, what was the outcome of the White case? In the White v. Beale case, the Court overturned the State's standard on comparability grounds so that it violated the requirements of comparability. The Court did leave open the possibility, as counsel for the State has pointed out, that there could potentially be a determination as to whether people needed eyeglasses based on how bad their eyesight was, whether somebody had 20-40 vision or 20-200 vision. That would be equivalent here to a very different measure from what functional ranks and functional index scores look at. They do not look at – every single plaintiff in this case and every member of this class has been determined by trained social workers, as the State repeatedly points out, to need every service that is authorized under the IHSS program in order to remain safely in their homes. That's the requirement of the Welfare and Institutions Code. That's a requirement of the regulations. And that's supported by a number of declarations in the record that no service shall be authorized unless necessary to remain in the home. So all of these services are necessary. They're medically necessary. The only question is what is the nature of the assistance that is required, what is the amount of time that that is likely to require, and essentially what Your Honor has pointed out is the amount of service that is required. That is a very different concept from severity of need or criticality or medical necessity in Medicaid terms. The district court found that functional index scores and functional ranks do not measure severity of need or criticality. That finding can be found on ER 175. There are very similar findings at ER 172, 173, and 175. And that finding may be overturned only if it is determined to be clearly erroneous, meaning that no evidence supports that finding, or that the finding is implausible in light of the record. Here, the overwhelming weight of the finding is based on. What was that finding based on, essentially? Just that these scores had not been used in the past for this purpose, right? Not only that, Your Honor. That was part of it, that the scores had not been used in the past for this purpose, that the scores and the ranks were not designed for this purpose. Obviously, they have been in existence for years. Your Honor, the FI score was initially adopted in 1988, and the intent was to use it as a general guideline to ours. In 1989, however, the State came out with a the State studied this, and in 1996 there was a recommendation given for a wholesale revamping of the FI score. The State has itself said that the FI score is no longer used because it was found to be not useful. The FI score, there are repeated declarations from county officials that the FI score has never been used. That is supported strongly in the record. Functional ranks have been used, but the only way in which they have been used is that they are used to establish general guidelines for how much assistance, in terms of time, somebody is likely to need. So if you have a functional rank of three for a particular service, that puts you in a category, say, of three to five hours. However, the time guidelines ranges overlap, so somebody who has a two may in fact require just as much time as somebody who has a four. And social workers are required to deviate from those ranges if the individual needs of the recipient dictate that that is important. All right. Counsel, suppose you were administrator of this program for the State,  the amount available for the next year is going to be 10% less than what the current amount is. How would you go about reducing the expenditures based on need so you would conform to these other Federal laws? Well, there are a number of options that the State could have pursued that it did not. The State repeatedly says that these services are being authorized as a matter of convenience and not because they're actually essential. If that is really the case, the State could make clear to the social workers that these services may only be authorized when they are a necessity for health and safety, and through the reassessment process, which happens for every individual every year, make sure that the social workers reassess and determine if people actually need these services. Similarly, the State places a lot of weight on the supposed availability of alternative services, family members, regional centers, other options for individuals. The State could pursue changing regulations or giving clear guidance to social workers so that alternative services may better be taken into account. Couldn't they eliminate some of the 11 discrete services? It would depend on whether that constituted any kind of violation of the Medicaid Act, if they were able to make a reasonable determination that a service was not necessary for the health or safety of the people living in their homes. And it would also depend on whether that would result in institutionalization and would violate the State's independent obligations under the Olmstead Act. And I actually have a couple of points I'd like to make about – I'm sorry, under the Olmstead case. A couple of points I'd like to make about Olmstead that we didn't have a chance to respond to because some points were made in the State's reply brief. And in Sanchez v. Johnson, this Court discussed the State's Olmstead plan, which is a plan to deinstitutionalize and keep out of institutions in the first place individuals who can live in the community if they receive necessary services. The State's Olmstead plan is in the record. And at SCR 230, the State's Olmstead plan says, and this is a direct quote, that IHSS is an essential component of the State's effort to provide services to maintain individuals in their homes and their communities. The Department of Justice filed a brief explaining that establishing a serious risk of institutionalization violates that obligation under the ADA and under the Olmstead case. That position that the United States has taken in this case is entitled to deference. The State argues in its reply brief that the amicus brief is not entitled to deference and it cites to independent living center. However, independent living center makes clear that an agency position in an amicus brief is not entitled to deference when the agency is not interpreting its own regulation. Here the Department of Justice is interpreting its regulation. That's 28 CFR 35.130D, which is the integration regulation. And the Department of Justice is entitled to deference under numerous recent Supreme Court and Ninth Circuit decisions. The District Court found that these individuals will be at serious risk of institutionalization and that this risk need not be imminent. And that this risk, the District Court found a serious risk of institutionalization at ER 182 and 187, specifically with respect to the named plaintiffs and the Department of Justice position that that is sufficient to establish an Olmstead violation is correct. And that would not require this Court to determine whether functional ranks or FI scores were adequate measures of severity of need or criticality or medical necessity. When I come back to the question I asked before, the state presumably is in a serious financial crisis and must make a decision on a very instant kind of basis. And apparently that's what the legislature thought it was doing. Is there any other existing scale of some sort which would meet your view of the need requirement? Your Honor, I am not aware of any such scale. And, in fact, in the legislative analyst report that the state has sought judicial notice of, the legislative analyst recommends that the state adopt some kind of measure of how likely people are to face institutionalization if they lose IHSS services. The state does not have such a measurement now. There are other options, however, that the state could have pursued. There are waivers of Medicaid requirements that are available under Federal law. One of the things the state could do, in fact, I think it was contemplated, is to get rid of IHSS altogether, right? There's no requirement that the state has to have an IHSS program. Your Honor, the IHSS is an optional service. If the state were to get rid of the program entirely, I believe that we would have a very serious Olmstead claim that that would result in institutionalization of thousands of people. But the Medicaid Act itself does not require the provision of in-home supportive services. That is correct. You see, that's where I have the problem here. Because it seems to me that you have to look at some reasonably existing method on a short-term basis to decide how these funds, these reduced funds, are going to be reallocated. You can't continue the service that is in existence today. It has to be reduced by some amount immediately. What else could the state have done on that kind of basis beyond what it did do, and simply take the rankings, which have been followed, as you say, since 1988, and say that's what we're going to use to as a proxy for need? Your Honor, just to clarify, the FI scores were adopted in 1988. They have not been used for any purpose since that time. The idea was that they would be a quality control measure, but they were not used for that purpose. The State in the past has pursued an across-the-board hours cut. It determined that the amount of hours that were allocated were more than was necessary. But when the State did that, it had an exception process where individuals could apply and could make a showing that they actually needed the hours that they had been allocated in order to remain safely in their homes. Would the hours cut have met the need requirements from your point of view? Your Honor, it would depend on the record that was before the Court. But I'm trying to present other options that the State could have pursued that would not have been as arbitrary and irrational as using measures that were not designed to measure the severity of need or criticality of the need that people faced. So there are other options that the State has pursued in the past. The State, States across the country have pursued waivers of the Medicaid comparability requirement. That is something that the State could have pursued if it intended to narrow the program. The State has defined the purpose of the program to be to permit individuals to remain safely in their homes. And that is the purpose that then becomes relevant for Medicaid Act analysis, and the State acknowledges that. The State could have narrowed that if it had intended and sought the appropriate waivers from federal officials. If the State believes that services are being allocated incorrectly, it could also instruct there to be rapid reassessments that take place sooner than the one-year requirement for everyone. I wanted to also take the opportunity to correct a couple of statements in the State's oral argument, one regarding standing. I wanted to clarify that the State has moved to dismiss only the unions on standing grounds below. It did not move to dismiss any of the recipient plaintiffs. And, in fact, that motion is not pending. As explained in a footnote of our supplemental brief on standing, the State and the plaintiffs agreed to stipulate to stay the district court proceedings, and when the district court asked both sides, do you want me to rule on the pending motions, which included the motion to dismiss, the State said that it did not want the court to rule on the pending motions. So that motion is pending, but the State has actually asked the court not to rule on that motion. And also regarding standing, I do want to clarify that one of the named plaintiffs, Ms. Jones, does, in fact, have standing to assert the ‑‑ I mean, we don't believe this is a standing ‑‑ proper standing inquiry, but does, in fact, have hours allocated for meal preparation services because she needs her meals to be cut up a certain way so that she is able to eat. And that can be found, her declaration at ER 1748. And she also does need reminders in order to eat because of her condition. What about, Mr. ‑‑ Regardless what the agreement is between counsel as to disposition of the motion on standing, don't we have an independent suspended duty to examine standing and rule on it? Yes, Your Honor. This Court does have an independent obligation to examine Article III standing. I would agree. Not prudential standing, however, and we believe that that is. What about Mr. Brown's argument which goes to standing that, you know, a couple of the plaintiffs are eligible for the same services categorically under the Lanterman Act? Your Honor, we have demonstrated below that the regional centers themselves have informed named plaintiffs and have informed county officials that those services will not be available. No, but he says that's a claim you should pursue under the Lanterman Act. Well, the fact that plaintiffs may have an alternate remedy for the deprivation of services does not deprive them of Article III standing to raise the injury that will result from the deprivation of IHSS services. In addition, even if you accepted the State's argument, despite the factual record, that regional services will fully replace IHSS services, there is undisputed evidence in the record, and I'd like to point you to ER 752 to 756 and ER 794, that there will be a delay in the provision of those services. And we've shown through evidence that the district court cites in the district court decision below that even a temporary deprivation of services will result in irreparable harm to the plaintiffs. And if it pleases the Court, I'd like to reserve the remaining time for my co-counsel. You may do so. Ms. Bird. I'd like to address the issue of the due process claim. But I'd like to note first that if this, because of the doctrine of constitutional avoidance, if this Court is able to affirm the injunction on the Medicaid claims or the ADA claims, it need not reach these. due process claims. Now, the State has argued in its briefs that the planned notices to Before you get there, isn't there, which of the plaintiffs you claim have standing to raise the due process claim? In other words, which plaintiff has been harmed by any due process violation? Well, first I would say, Your Honor, that all of the plaintiffs have been harmed because the violation of due process has been considered by the Supreme Court to be injury per se. Injury per se in the sense that my understanding is the notice is only intended to go to, you know, whether or not the classification is correct, right? That is correct, Your Honor. And your case doesn't depend on classification. You're saying this whole system is rotten. Well, Your Honor, we also, though, if the Court finds that the classification system is good enough and upholds that aspect of it, it is crucial that these 100 more than 100,000 people know how to challenge inaccurate classifications and that they know to request aid pending their appeal, that they know how to request a home hearing. Many people will be deterred, for example, because they will not know. People are homebound. Dottie Jones, one of our named plaintiffs, is an example of someone who has great difficulty leaving her home. And the notice fails to inform her that she can request a home hearing. Well, what's your answer, you know, to the question of, well, is any plaintiff making a claim that his or her case depends upon, you know, the functional index category? The answer is no, isn't it? Well, we have our initial position, Your Honor, I will say this for most of our named plaintiffs, is that we have no reason to believe that the rankings are incorrect. In the case of one, Mr. Oster, he was reassessed shortly before we filed. His hours were increased, so he's actually getting more IHSS. His ranks remain the same, so after this increase, he'll be completely terminated. So in Mr. Oster's case, it may be that he does not have grounds to claim, grounds to challenge his rankings. But I have to say, it's not clear. We don't know how his rankings were set at this point. For other plaintiffs, there is evidence in the record that suggests, and I'd call the Court's attention particularly to Plaintiff V.L., one of our child plaintiffs. There is evidence in the record that the rankings may, in fact, be inaccurate, and the notice doesn't give that child's mother enough information to know to request a hearing, to know how to go about it, to know the effective date. The notice doesn't even explain the deadline for an appeal. So there are serious problems with the notice. The notice here is, and I hold it here and you can find it at ER 1334, it's effectively incomprehensible to recipients. And the district court found that the notice was grossly inadequate under undue process grounds based on the testimony of an expert, for example, who agreed that it uses acronyms, it uses highly technical language, that it will simply not be comprehensible. So as to the standing issue, counsels also argued that because these clients are represented, of course they know what the notice means. We've found every procedural due process case has this same issue. If there's counsel involved, there's someone to explain. That's never been a bar to considering a due process case. Thank you, counsel. Your time has expired. Thank you. Mr. Brown, you've reserved some time. Thank you, Your Honor. I'd just like to point out that no court has ever stretched Section 810B's comparability provision as far as the district court did here, and as far as plaintiffs would need this court to stretch it in order to prevail. If this court were to do so, it would absolutely open up Pandora's box, opening basically every need-based distinction made by any state to judicial second-guessing about all the experts. That is not what Congress intended. That's not what Section 810B is about. Well, I guess the heart of this case is whether or not those rankings can properly be used as a way to measure need. What's your response to the argument made by Ms. Layden? The rankings are absolutely need-based. They've been around for over 20 years, both the rankings and the FI score. But she says some of them haven't been used. Well, they had not been used previously as a distinction, as a threshold for actually getting the services, but they had absolutely been used for the past 22 years as a measure of need. It was originally a uniformity standard to ensure that social workers across the state were giving the same level of services to people with the same level of need. The entire design of the ranks is to assess the level of need for the recipients. So, therefore, it makes perfect sense. It's absolutely reasonable for the legislature here to decide if we have this existing standard that measures need, if we're going to eliminate some services based on need, what better way is there to do it than to look at this existing standard that's been tried and tested over 20 years? And, again, to look at the way that those ranks are used here, there are a lot of backstops to ensure that there will be additional protections for anyone who might fall through the cracks. You recall my question about how would Ms. Layden go about making reductions in services because of funding limits. She listed a whole bunch of other things that you could have done. What's your response to that? Well, the legislature has many options at its disposal, but that's a decision for the legislature as the elected representatives of the people to come up with the best way as a policy matter to address that. That's not something that courts should be getting into the business of second-guessing and engaging in a battle of experts of, is this really the best way to do it? The question is, is this a reasonable needs-based way? And here we believe it absolutely is. Again, this is tried and tested over 20 years. Where did Judge Wilkin go wrong from your perspective? Was it a threshold finding as to what the range of services was or was it an assumption that we're talking about general health care or what? She made fundamental legal errors at the outset in terms of what the statutes at issue require and what sort of inquiry is proper under the statutes. Okay, but what areas specifically? What's your specific challenge? Under the comparability provision, again, she stretched that far beyond what any court has ever done. It's very clear from every court that's considered it, from the regulations, states may make need-based decisions, and those are legislative policy decisions. States may not discriminate based on diagnosis, type of illness, or condition, and that's not what happened here. This is a need-based distinction. Again, it's improper to go into getting into the accuracy of that need-based distinction once the legislature has made that policy judgment. Very well. Your time has expired. The case just argued will be submitted for decision, and the court will adjourn.
judges: Bennett, O'scannlain, Tashima